# UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA— DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:      Nazareth, PA

Address of Defendant:      420 Montgomery Street, San Franscisco, CA

Place of Accident, Incident or Transaction:  Eastern District of Pennsylvania
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))                Yes ☒   No ☐

Does this case involve multidistrict litigation possibilities?                        Yes ☐   No ☒
*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                                Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                                                                                Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                                                                                Yes ☐   No ☒

CIVIL: (Place _ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☒ All other Federal Question Cases
(Please specify) Real Estate Settlement Procedures Act of 1974 (RESPA)

B. *Diversity Jurisdiction Cases:* n/a

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability— Asbestos
9. ☐ All other Diversity Cases
(Please specify)

## ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I,    Joseph H. Meltzer, Esq.                    , counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE:    1/31/08                                  80136
                    Attorney-at-Law                    Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:    1/31/08                                  80136
                    Attorney-at-Law                    Attorney I.D.#

CIV. 609 (4/03)

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KYLE J. LIGUORI, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY | JURY TRIAL DEMANDED |
| Defendants. | |

**INTRODUCTION**

1.     Wells Fargo & Company, one of the nation's largest financial services companies, together with certain participating subsidiaries and/or affiliates, including Wells Fargo Bank, N.A., operating under various trade names (collectively referred to herein as "Wells Fargo" or the "Company") has acted in concert with its affiliated reinsurer, North Star Mortgage Guaranty Reinsurance Company ("North Star") to effectuate a scheme whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal referral payments in the form of purported reinsurance premiums are paid by private mortgage insurers to North Star; and (b) Wells Fargo receives an unlawful split of private mortgage insurance premiums paid by its borrowers.

2.     This is a proposed national class action brought by Plaintiff on behalf of himself and a class of all other similarly situated homeowners who obtained residential mortgage loans through Wells Fargo or any of its subsidiaries and paid for private mortgage insurance issued by insurers with whom Wells Fargo had captive reinsurance arrangements. In this action, Plaintiff challenges a secretive conspiracy to circumvent RESPA's prohibition against kickbacks and unearned fees. Members of the conspiracy included Wells Fargo & Co., Wells Fargo Bank,

- 1 -

N.A., North Star Mortgage Reinsurance Co. and unnamed co-conspirator private mortgage insurers.

3.      Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance. Private mortgage insurance protects the lender in the event of a default by the borrower. The premium is paid by the borrower and is usually collected by the lender with the borrower's monthly payments. Borrowers typically have no opportunity to comparison-shop or select the private mortgage insurer.

4.      Section 2607 of RESPA prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance. Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home.

5.      Wells Fargo has attempted to circumvent RESPA's prohibition against accepting kickbacks and unearned fees by arranging for the private mortgage insurer to pay an excessive portion of borrowers' private mortgage insurance premiums to North Star in the form of purported reinsurance premiums.

6.      While these payments to Wells Fargo's wholly-owned subsidiary were purportedly for "reinsurance" services, North Star received these payments while assuming very little or no actual risk. For instance, from 1999 through the end of 2006, Wells Fargo's captive reinsurer received **nearly $400 million** from leading primary mortgage insurers as its "split" of borrowers' mortgage insurance premiums—over $74 million in 2006 alone. In stark contrast, its actual insurance losses, as reflected in the total amount of claims paid, were **zero**. In other words, the millions of dollars collected by Wells Fargo through its captive reinsurance arrangements far exceeded the value of any services rendered.

7.    This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

9.    Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiff's mortgage loan transactions is located in this district, Defendants reside in this district and a substantial part of the events giving rise to the claims occurred in this district .

## PARTIES

### Plaintiff

10.    Plaintiff Kyle J. Liguori resides in Nazareth, Pennsylvania.  On June 6, 2007, Plaintiff Liguori obtained a residential mortgage loan from Wells Fargo Bank, N.A. for the purchase of a home, with a downpayment of less than 20%, and was required to pay for private mortgage insurance from a provider selected by Wells Fargo.  Plaintiff Liguori paid for private mortgage insurance from an insurer with whom Wells Fargo had a captive reinsurance arrangement and, further, Plaintiff Liguori's loan was included in a pool of loans reinsured through North Star by his private mortgage insurer.

### Defendants

11.    Defendant Wells Fargo & Company is a Delaware corporation with its corporate headquarters located at 420 Montgomery Street, San Francisco, California.  Through its subsidiaries, Wells Fargo & Company conducts business nationwide. Wells Fargo & Company, the parent company of Wells Fargo Bank, N.A. and North Star, is a proper party to this action, as

it was and is a recipient of the unlawful kickbacks and unearned fees described herein. Upon information and belief, North Star funnels reinsurance premiums to Wells Fargo & Company. Under RESPA Section 8(b), 12 U.S.C. 2607(b), it is unlawful for *any* person to accept any portion of an unearned fee. Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for 3 times the amount paid for the settlement service.

12.    Defendant Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls, South Dakota, headquartered in San Francisco, California, and operates the Wells Fargo Home Mortgage division from Des Moines, Iowa.

13.    Defendant North Star is a Vermont corporation.

## FACTUAL ALLEGATIONS

### Wells Fargo's Operations

14.    Wells Fargo & Company is a financial services holding company and, through its numerous subsidiaries, operates in a variety of retail, corporate and commercial banking and related financial services business.

15.    Wells Fargo Bank, N.A. is the principal banking subsidiary of Wells Fargo & Company. As of December 31, 2006, Wells Fargo Bank, N.A. had assets of nearly $400 billion, representing approximately 83% of the assets of Wells Fargo.

16.    Wells Fargo originates residential mortgage loans through its home loan division, known as "Wells Fargo Home Mortgage," headquartered in Des Moines, Iowa. Through its home mortgage division—which generated nearly $4.2 billion in revenue in 2006 alone—Wells Fargo is one of the nation's largest originators of residential mortgage loans.

17.    Wells Fargo originates and funds mortgage loans through numerous retail branches, the internet (including the website: https://www.wellsfargo.com/mortgage), as well as other methods, including sourcing loans through a network of outside mortgage brokers.

Additionally, the Company originates and funds mortgage loans through unconsolidated joint ventures with affiliates companies of which the Company owns an interest of 50% or less.

18.     Wells Fargo operates over 6000 retail stores and has approximately 158,000 employees.

19.     Through its subsidiary North Star, Wells Fargo enters into agreements to provide purported reinsurance services to primary private mortgage insurance providers with respect to mortgage loans originated, funded and/or serviced by Wells Fargo.

### Private Mortgage Insurance Industry

20.     In order to lessen risk of default, lenders typically prefer to finance no more than eighty percent of the value of a home, with the remaining twenty percent being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

21.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home. Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party -- the private mortgage insurer -- to protect the lender in the event of a default by the borrower.

22.     Private mortgage insurers are typically unaffiliated third-party companies who agree to cover the first twenty to thirty percent of the amount of the potential claim, including unpaid principal, interest and certain expenses.

23.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the more mortgage insurance required.  For example, more private mortgage insurance is required with a five percent down payment than with a fifteen percent down payment.  Additionally, more private mortgage insurance may be required for adjustable-rate mortgages than for fixed-rate

mortgages.

24.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays the premiums, usually through an addition to the borrower's monthly mortgage payment.

25.     Borrowers generally have no opportunity to comparison-shop for private mortgage insurance.  The private mortgage insurer is selected by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, is determined by the lender and the private mortgage insurer, rather than negotiated between the borrower and the private mortgage insurer.

26.     The private mortgage insurance industry began with the founding of Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and is dominated by MGIC and other companies, including, without limitation:   PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation, Radian Guaranty Inc., AIG United Guaranty, Triad Guaranty Insurance Corporation and Republic Mortgage Insurance Company.  Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA").  According to its website, MICA's members include each of the foregoing insurers, with the exception of Radian Guaranty.

27.     According to MICA, new private mortgage insurance contracts for its member firms have consistently exceeded $200 billion per year since 1998.  MICA member-firms issued over 1.4 billion new certificates of mortgage insurance in 2006, representing over $226 billion in new insurance written.  MICA 2007-2008 Fact Book & Membership Directory, available at www.privatemi.com.

28.     Private mortgage insurance is limited to the conventional home loan market.

Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration and the Veterans Administration, maintain their own form of mortgage default insurance.

### RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related To Private Mortgage Insurance Policies

29.    RESPA is the primary federal law regulating residential mortgage settlement services.   The United States Department of Housing and Urban Development ("HUD") is charged with enforcing RESPA.  HUD has promulgated the implementing rules for RESPA.  See Regulation X, 24 C.F.R. § 3500.

30.    RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers.   "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result…**(2)** in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  12 U.S.C. § 2601(b).

31.    A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

32.    In 12 U.S.C. 2607**(a)** RESPA provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

33.    In 12 U.S.C. 2607(b) RESPA provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

34.    Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

35.    The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity…The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

36.    Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance." 24 C.F.R. § 3500.2(b).

37.    Under RESPA, therefore, Wells Fargo is prohibited from accepting referral fees from a private mortgage insurer or from splitting private mortgage insurance premiums with the insurer other than for services actually performed by the captive reinsurer.

**Mortgage Reinsurance Industry**

38.    Private mortgage insurers may enter into contracts with reinsurers, whereby the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans.  In return, the private mortgage insurer pays to the reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

39.    Mortgage reinsurance arrangements can generally take two forms: (a) "quota share" and (b) "excess loss."

40.    In a quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences losses, the reinsurer is certain to experience losses in the percentage agreed upon in the reinsurance coverage.

41.    In an excess loss reinsurance arrangement, however, the reinsurer is liable only for claims, or a percentage thereof, above a particular ceiling.  Unlike the quota share arrangement, the excess loss method does not necessarily result in any loss being shifted to the reinsurer.

42.    The likelihood of the reinsurer experiencing any losses under this arrangement depends not only on the amount of losses by the private mortgage insurance, but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer sets the excess loss level at an amount where the reinsurer bears actual risk of loss.

**Captive Mortgage Reinsurance Arrangements and HUD's Concern About RESPA Anti-kickback Violations Under Such Arrangements**

43.    Lenders produce customers for private mortgage insurers.  Certain lenders, seeking to capitalize on the billions of dollars their borrowers pay to these insurers in premiums each year, have established their own affiliated or "captive" reinsurers.  These captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates that require the borrower to pay for private mortgage insurance.

44.    Under "captive reinsurance arrangements," the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers'

premiums to the lender's captive reinsurer.

45.    Captive mortgage reinsurance arrangements raise obvious RESPA kickback problems.  Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the borrower's premium revenue through its captive reinsurer.  The insurer stimulates its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

46.    Simply put, as opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, an unscrupulous lender can use a captive reinsurance arrangement to funnel such unlawful kickbacks.

47.    Concerned that these transactions would be designed to disguise a funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA's anti-kickback violations.

48.    The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original).

49.    The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk." HUD warned that "The reinsurance transaction cannot be a sham under which premium payments… are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."

50.    The HUD letter states "This requirement for a real transfer of risk would clearly

be satisfied by a quota share arrangement, under which the reinsurer is bound to participate <u>pro rata</u> in every claim" (emphasis in original).

51.     The HUD letter contrasts the excess loss method of reinsurance.  HUD states that excess loss reinsurance contracts can escape characterization as a referral fee or fee-split only:

> …if the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band.  Unless there is a real transfer of risk, no real reinsurance services are actually being provided. In either case, the premiums paid…must be commensurate with the risk.

52.     Notably, state insurance commissioners and federal regulators have investigated and condemned similar captive reinsurance arrangements in the title insurance industry as sham transactions designed to funnel unlawful kickbacks for business referrals.  As a result, a number of providers have abandoned such arrangements altogether.

53.     The National Association of Insurance Commissioners ("NAIC") also has addressed the accounting treatment of premiums ceded to captive mortgage reinsurers.  Under the annual statement requirements of the NAIC, private mortgage insurers should not treat as authorized reinsurance amounts ceded to lender-captive reinsurers where adequate risk is not transferred.  Rather, such amounts should be accounted for under the less beneficial deposit accounting guidelines and identified as though unauthorized accounting was being utilized.

### Wells Fargo's Captive Reinsurance Arrangements

54.     In connection with the billions of dollars in home loans originated by Wells Fargo, many of its borrowers pay for private mortgage insurance.

55.     Wells Fargo enters into "captive reinsurance arrangements," whereby it refers its borrowers to private mortgage insurers, who agree to reinsure with North Star. These insurers include at least:  Mortgage Guaranty Insurance Corporation, PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation, Radian Guaranty Inc., AIG United Guaranty, Triad

Guaranty Insurance Corporation and Republic Mortgage Insurance Company.

56.     Wells Fargo has a strong financial interest in steering business to private mortgage insurers who, in turn, agree to reinsure with North Star on terms that will produce significant kickbacks to Wells Fargo.

57.     North Star enters into reinsurance agreements solely with respect to loans originated by Wells Fargo.

58.     Under Wells Fargo's captive reinsurance arrangements, the primary insurer pays North Star a percentage of the premiums paid by borrowers on a particular pool of loans; in return, North Star purportedly agrees to assume a portion of the insurer's risk with respect to the loans involved.

59.     In fact, little or no risk is actually transferred from the primary insurer to North Star in exchange for the insurer payments to North Star.  The actual risk, if any, transferred to North Star is not commensurate with the premiums it extracts from the private mortgage insurer.

60.     The numbers speak for themselves.  For instance, from 1999 through the end of 2006, Wells Fargo's captive reinsurer has collected from private mortgage insurers approximately **$399,835,000** as its "share" of borrower's private mortgage insurance premiums. In contrast, its "share" of paid insured losses was **zero**:

| YEAR | PREMIUMS RECEIVED BY REINSURER | LOSSES PAID BY REINSURER |
|------|-------------------------------|--------------------------|
| 2006 | $74,151,000 | $0 |
| 2005 | $72,053,000 | $0 |
| 2004 | $73,578,000 | $0 |
| 2003 | $62,840,000 | $0 |
| 2002 | $73,578,000 | $0 |

| | | |
|---|---|---|
| 2001 | $31,185,000 | $0 |
| 2000 | $12,450,000 | $0 |
| **TOTAL:** | **$399,835,000** | **$0** |

61.     This clear, disturbing pattern of excessive premiums compared to the actual transferred risk continued throughout at least 2006 and, upon information and belief, throughout 2007.

62.     As HUD noted during its recent testimony by Assistant Secretary for Regulatory Affairs and Manufactured Housing Gary M. Cunningham before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

63.     The millions of dollars collected by Wells Fargo through its captive reinsurer have clearly not been commensurate to its actual risk exposure.  The Company has received millions of dollars in payments, while bearing little or no risk of loss.

64.     In reality, Wells Fargo's captive reinsurance arrangements were and are sham transactions for collecting illegal kickbacks in return for referring private mortgage insurance business to certain insurers.

65.     The money Wells Fargo collected through its captive reinsurer far exceeded the value of the services, if any, it performed.  There was no real transfer of risk or, at least, not a commensurate transfer of risk.  The amounts paid were simply disguised kickbacks to Wells Fargo for the referral of borrowers to private mortgage insurers.

66.     These arrangements keep premiums for private mortgage insurance artificially

inflated because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders. In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage *and* private mortgage insurers' unlawful kickbacks to lenders.

67.    Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers. As a result, private mortgage insurance premiums incorporate the payment of such kickbacks -- to the detriment of consumers.

## CLASS ACTION ALLEGATIONS

68.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of a general class consisting of all persons who obtained residential mortgage loans originated and/or acquired by Wells Fargo and/or its affiliates and, in connection therewith, purchased private mortgage insurance and whose loans were included within Wells Fargo's captive mortgage reinsurance arrangements (the "Class").

69.    The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

70.    The Class is so numerous that joinder of all members is impracticable.

71.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

72.    Plaintiff's claims are typical of the claims of the Class.

73.    There are questions of law and fact common to the Class, including but not limited to:

(a)    Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

(b)    Whether payments to Wells Fargo's captive reinsurer were *bona fide* compensation and solely for services actually performed;

(c)    Whether payments to Wells Fargo's captive reinsurer exceeded the value of any services actually performed;

(d)    Whether Wells Fargo's captive reinsurance arrangements constituted unlawful kickbacks from private mortgage insurers;

(e)    Whether Wells Fargo accepted a portion, split or percentage of borrowers' private mortgage insurance premiums other than for services actually performed; and

(f)    Whether Defendants are liable to Plaintiff and the Class for statutory damages pursuant to RESPA § 2607(d)(2).

74.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.    North Star's reinsurance agreements were not entered into for each individual borrower; rather, Defendants' reinsurance arrangements covered *pools* of loans for each private mortgage insurer with whom North Star contracted.

75.    The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated by Wells Fargo or acquired from third-party lenders.  Plaintiff's sole claim is for violation of Section 8 of RESPA, 12 U.S.C. § 2607.  Section 8(b) of RESPA, 12 U.S.C. § 2607(b), does not require a referral, but, as described herein, contains a general prohibition against the acceptance of any unearned settlement services charges.  Therefore, *regardless* of whether Wells Fargo or a third-party lender made the initial referral to the private mortgage insurer, Defendants' acceptance of any unearned portion of the private mortgage insurance premiums paid by such borrowers violates RESPA, as described

herein.

76.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has no claims antagonistic to those of the Class.  Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

77.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants.

78.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

79.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

80.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**CLAIM FOR RELIEF**

**VIOLATION OF RESPA, 12 U.S.C. § 2607**

81.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

82.    Throughout the Class Period, Wells Fargo provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

83.    The amounts received by Wells Fargo through its captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

84.    Plaintiff and the Class obtained federally-related residential mortgage loans through Wells Fargo and paid millions of dollars for private mortgage insurance premiums in connection with their real estate closings. Defendants arranged for an unlawfully excessive split of borrowers' premiums to be paid to North Star.

85.    The millions of dollars in premiums accepted from private mortgage insurers: (a) were not for services actually furnished or performed; and/or (b) exceeded the value of such services.

86.    The millions of dollars accepted by Wells Fargo through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements with private mortgage insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers. Such practice violated RESPA, 12 U.S.C. 2607(a). North Star—Wells Fargo's subsidiary—participated in the scheme and served as the direct conduit by which the kickbacks were funneled. North Star agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiff and the Class.

87.    In connection with transactions involving federally-related mortgage loans, Wells

Fargo accepted a portion, split or percentage of charges received by private mortgage insurers for the rendering of real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b). The money paid by private mortgage insurers to Wells Fargo and accepted by Wells Fargo through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by Wells Fargo's customers. North Star—Wells Fargo's subsidiary—participated in the scheme and served as the direct party to which the split was paid. North Star agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiff and the Class.

88.    Plaintiff and the Class were, in fact, harmed by Defendants' unlawful kickback scheme.

89.    First, Plaintiff and the Class were overcharged for mortgage insurance. Kickbacks and unearned fees unnecessarily and artificially inflate settlement service charges. Under Wells Fargo's scheme, the mortgage insurance premiums paid by Plaintiff and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to Wells Fargo's captive reinsurer that far exceeded the value of any services performed and, were, in fact, illegal referral fees.

90.    Second, *regardless* of whether Plaintiff and the Class were overcharged for private mortgage insurance, and *regardless* of the reasonableness or unreasonableness of the rates Plaintiff paid for private mortgage insurance, under RESPA, Plaintiff and the Class were, as a matter of law, entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes. Congress has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties. Plaintiff alleges that Defendants have accepted unlawful kickback payments

and/or an unearned portion of settlement service charges in violation of RESPA—allegations and claims completely distinct and separate from whether the price he paid for settlement services was "unfair".

91.    Defendants therefore violated RESPA, 12 U.S.C. 2607.  Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are liable to Plaintiff and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

92.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiff also seeks attorneys' fees and costs of suit.

## TOLLING OF STATUTE OF LIMITATIONS

93.    Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule.  Putative Class members whose claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and should apply.  Such putative Class members could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.  Further, Defendants knowingly and actively concealed the basis for the Plaintiff's claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.  For these reasons, any delay by the members of the putative Class whose claims accrued prior to one year preceding the commencement of this action was excusable.

94.    Due to the complex, undisclosed and self-concealing nature of Wells Fargo's scheme to collect illegal kickbacks from private mortgage insurers, the putative Class members whose claims accrued prior to one year preceding the commencement of this action did not possess sufficient information or possess the requisite expertise in order to enable them to discover the true nature of Defendants' captive reinsurance arrangements.

95.     This complex action is dissimilar to a simple type of RESPA case where, for example, an attentive borrower may determine—from a careful examination of his HUD-1 settlement statement—that he was overcharged for a settlement service or that too much money is being paid from his proceeds to his lender, real estate agent, title insurer or other settlement service provider. Rather, the conduct described herein occurs behind closed doors, with a wispy trail virtually impossible for the average homeowner to follow.

96.     Plaintiff Kyle J. Liguori was able to discover the underlying basis for the claims alleged herein only with the assistance of counsel. Plaintiff and the putative Class members had no basis upon which to investigate the validity of the undisclosed payments to North Star for purported reinsurance. Putative Class members' delay was excusable because they did not discover, and reasonably could not have discovered Defendants' conduct as alleged herein absent specialized knowledge and/or assistance of counsel.

97.     Further, Wells Fargo engaged in affirmative acts to conceal the facts and circumstances giving rise to the claims asserted herein. Wells Fargo affirmatively represented to Plaintiff and the Class that any amounts it received from its captive reinsurance arrangements were for services actually performed. Pursuant to RESPA § 2604(c) and the accompanying regulations set forth in 24 C.F.R. 3500.7, if Wells Fargo required the use of a particular provider of settlement service, it was obligated to describe the nature of any relationship between Wells Fargo and such provider.

98.     The putative Class members did not possess sufficient information to even put them on notice of the true nature of Wells Fargo's captive reinsurance arrangements. The average homebuyer is not an insurance expert. Simply being told that Wells Fargo may enter into reinsurance relationships is absolutely insufficient to put the average homebuyer on notice

that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated. Wells Fargo intentionally designed any disclosure that it provided in such a manner as to conceal from the putative class members information sufficient to put them notice of the underlying basis for their claims. Thus, the putative class members were not put on notice of Wells Fargo's wrongdoing. *See Boudin v. Residential Essentials, LLC*, No. 07-0018, 2007 WL 2023466 at * 5 (S.D. Ala. 2007). For instance, Wells Fargo did not disclose to borrowers that its captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by North Star. Thus, Wells Fargo concealed information that could have put the putative Class members on notice that there was inadequate assumption of risk by North Star.

99.    The putative class members exercised due diligence by fully participating in their loan transactions and reviewing relevant loan documents. Because of Defendants' actions and because of the nature of the reinsurance scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence. *Boudin*, 2007 WL 2023466 at * 5.

100.    Wells Fargo provided misleading information to Plaintiff and the Class, thus affirmatively acting to conceal its unlawful kickback scheme. By funneling kickbacks through North Star and representing that such payments were for services actually performed, rather than referral fees, Wells Fargo acted to conceal and prevent Plaintiff from discovering the underlying basis for this action. Any delay by the absent putative Class members is excusable and, accordingly, Plaintiff and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Class member.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

A.      This action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as a representative of the Class and Plaintiff's counsel as counsel for the Class;

B.      The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.      Plaintiff and the Class be awarded statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.      An order granting Plaintiff and the Class costs of suit, including reasonable attorneys' fees and expenses; and

E.      An order granting Plaintiff and the Class such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated:  January 31, 2008                          Respectfully submitted,

**SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP**

   JHM6596
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Mark K. Gyandoh, Esq.
Joseph A. Weeden, Esq.
280 King of Prussia Road
Radnor, PA   19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
     and
Alan R. Plutzik, Of Counsel
Robert M. Bramson, Of Counsel
2125 Oak Grove Blvd., Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

TRAVIS & CALHOUN, P.C.
Eric G. Calhoun, Esq.
1000 Providence Towers East
5001 Spring Valley Road
Dallas, Texas  75244
Telephone: (972) 934-4100
Facsimile: (972) 934-4101

BERKE, BERKE & BERKE
Andrew L. Berke, Esq.
420 Frazier Avenue
Chattanooga, TN  37402
Telephone: (423) 266-5171
Facsimile: (423) 265-5307

*Attorneys for Plaintiff*