## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE J. LIGUORI, etc. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 08-479 PD |
| | : | |
| v. | : | |
| | : | |
| WELLS FARGO & COMPANY, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFCATION

Defendants[1] submit this memorandum of law in opposition to plaintiff's motion for class certification.

### I.

### INTRODUCTION

Class certification should be denied. Of Rule 23(a) and (b)(3)'s six prerequisites for certification, this case fails to satisfy three: Typicality, adequacy and predominance.

The sole named plaintiff, Kyle J. Liguori ("Liguori") is not a typical or adequate class representative for three reasons.

First, unlike most class members, Liguori's mortgage insurance was reinsured under a "quota share,"[2] not an "excess-of-loss" reinsurance policy. The difference is critical to the sole claim Liguori alleges for himself and the class. "Quota share" reinsurance does not violate Section 8 of the Real Estate Settlement Procedures Act

---

[1]    Defendants include Wells Fargo Bank, N.A. ("Wells Fargo"), North Star Mortgage Guaranty Reinsurance Company ("North Star"), and Wells Fargo & Company.

[2]    Declaration of Diane Herman ("D.H. Decl.") ¶ 4.

("RESPA"), 12 U.S.C. § 2607.  HUD has so declared; Liguori agrees.[3]

Class members whose mortgages were reinsured under "excess-of-loss" policies may argue the reinsurance premium was an illegal "kickback" because either no risk was transferred to the reinsurer or a risk incommensurate with the premium paid.[4]  Liguori cannot.  On his mortgage, North Star shared in the risk and premium on a proportionate basis from the first dollar of loss and premium.

Second, unlike the vast majority of class members, Liguori sued within a year of the violation he alleges.  The difference is crucial because RESPA claims are subject to a one-year limitations period.  12 U.S.C. § 2614.  The claims of the majority of the putative class are time-barred—unless they can prove, as a required element of equitable tolling, that they could not have discovered their claims earlier through the exercise of reasonable diligence.  Not only is Liguori free of this burden, but his timely discovery and filing of suit adds to class members' burden, illustrating that the claim was, in fact, discoverable.

Third, Liguori cannot adequately represent the portion of the proposed class that obtained loans from Wells Fargo's affiliates.  Liguori obtained his loan from Wells Fargo.[5]  He had no dealings with Wells Fargo's affiliates.  He lacks standing to assert any claim against the affiliates.  He cannot represent those who assert claims he lacks.

This case also fails the predominance criterion.  At least seven major issues in the case are individual, or at a minimum, not common.  These non-common issues substantially outweigh any common issues, precluding certification under Rule 23(b)(3).

---

[3]    Compl. ¶ 50 (quoting HUD Aug. 6, 1997 Letter to Sandor Samuels, Countrywide Home Loans "HUD 1997 letter").

[4]    The Defendants believe such arguments are specious.

[5]    D.H. Decl. ¶ 24.

First, liability is a non-common issue. To prove a RESPA violation, plaintiffs must show there is no real transfer of risk to the reinsurer, North Star, or that the premium paid to North Star was excessive for the risk transferred. Risk transferred is not measured by claims paid over the past six years, as plaintiffs suggest. (Compl., ¶ 60.) Reinsurance protects against catastrophic loss which, for a variety of reasons, may not be suffered in a single six-year period.

Even if claims paid were relevant, it is far from the only evidence on the issue. As defendants' evidence on this motion shows, the amount of risk transferred to North Star varied among 65 books of loans that North Star reinsured for seven different private mortgage insurance ("PMI") companies. Indeed, under some reinsurance agreements transferred risk varied from one reinsured loan to the next. Reinsurance premium also varied from loan to loan, from PMI insurer to PMI insurer and from one reinsured book to another. Defendants' non-common evidence of risk transfer will overwhelm plaintiffs' proposed common proof through lack of claims paid.

Second, for a large portion of the proposed class, equitable tolling of RESPA's one-year statute of limitations raises a crucial individual issue.[6] "Examination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew

---

[6]    Defendants have concurrently renewed their attack on plaintiffs' equitable tolling allegations by filing a renewed motion to dismiss or strike or, alternatively, motion for judgment on the pleadings. For reasons explained in that motion, the Court should confine this case to claims filed within the one-year limitations period, as Judge Alsup did when this case was litigated under a different name in California. *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 577-78 (N.D. Cal. 2007).

it."[7] The highly individual nature of this inquiry renders class treatment and class certifi-cation inappropriate.[8]

Third, lenders other than Wells Fargo originated about 20% of the loans North Star reinsures. To prove RESPA violations in connection with these correspondent loans, Liguori will have to show that the originating lenders selected a particular PMI insurer because of its reinsurance agreement with North Star. That fact can be established only by non-common proof.

Fourth, the proposed class includes borrowers who purportedly obtained loans from various unnamed affiliates of Wells Fargo. As to these borrowers, Liguori alleges no facts and has presented no evidence. He has not shown how he can prove the class claim as to these loans by evidence common to other class members who dealt with other entities.

Fifth, to establish class standing under RESPA, Liguori must offer proof that each class member was overcharged for PMI,[9] i.e., that there were cheaper alternatives. That proof will be individual as well. Each class member's circumstance will vary regarding the availability and pricing of alternative PMI.

Sixth, the filed rate doctrine will preclude recovery by class members in states where PMI insurance premiums are filed and approved by the state's insurance regulatory

---

[7]    *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320 (4th Cir. 2006); *see Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998).

[8]    *Thorn*, at 327; *see also O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 409, 411 (C.D. Cal 2000).

[9]    *Mullinax v. Radian Guar., Inc.*, 311 F.Supp.2d 474, 486 (M.D. N.C. 2004).

agency.[10]  State insurance law and practice vary widely in this regard, requiring separate consideration not only of 50 states' laws but also each of the seven PMI insurers' rate filings in each of those states.

Finally, Defendants' affirmative defenses raise issues concerning class members who are subject to defaults, bankruptcy proceedings and judgments.  These issues cannot be resolved efficiently on a classwide basis but rather necessitate burdensome and time-consuming individual inquiries by the Court.

In sum, Liguori has not satisfied three prerequisites for class certification—typicality, adequacy, and predominance.  His motion should, therefore, be denied.

## II.

## BACKGROUND

### A.    Private Mortgage Insurance

PMI "plays a vital role in the smooth functioning of this Nation's market in residential real estate by lowering the costs that potential homeowners pay for the credit necessary to purchase their homes." *Pedraza v. United Guar. Corp.*, 114 F.Supp.2d 1347, 1349 (S.D. Ga. 2000).  In other words, it puts people in homes allowing lenders to "offer cheaper terms of credit to those home purchasers whose down payment is less than 20% of the home's value." *Id.*

PMI "covers a lender for losses incurred when a borrower defaults on the repayment of a mortgage loan and the collateral is not sufficient to make the lender whole."[11]  It is a risk mitigant.  Among several alternatives, Wells Fargo offers PMI to

---

[10]     *Id.* at 484-86.

[11]     *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761, 762 (9th Cir. 2005).

borrowers to reduce risk on loans with high loan-to-value ("LTV") ratios.[12]  There are seven principal PMI companies[13] approved to write PMI on loans Fannie Mae and Freddie Mac purchase.  (D.H. Decl. ¶ 3.)

When Wells Fargo Home Mortgage ("WFHM"), Wells Fargo Bank, N.A.'s home loan division, originates a loan that requires PMI, WFHM selects the PMI insurer.  (K.H. Decl. ¶ 3.)  The PMI insurer reinsures certain WFHM-originated loans with North Star.  (D.H. Decl. ¶ 4.)

WFHM also acquires loans originated by correspondent lenders.  The originating correspondent lender selects the PMI insurer for those loans, WFHM does not.  (K.H. Decl. ¶ 2.)  Some correspondent lenders have their own captive reinsurance companies and have agreed with WFHM that loans they originate will remain in that captive's reinsurance pool even after the loans are sold to WFHM.  (D.H. Decl. ¶ 14.)  Loans originated by other correspondent lenders are placed in North Star's reinsurance pool about a month after WFHM acquires the loan.  (*Id.*)  Correspondent loans account for roughly 20% of North Star's reinsurance pool.  (*Id.*)

---

[12]    Wells Fargo also offers lender-paid PMI in return for a higher interest rate on the loan. (Declaration of Karl Hanson "K.H. Decl." ¶ 3.)  Another alternative Wells Fargo offers are piggy-back loans, a first loan for only 80% of the property's value (which therefore does not require PMI) plus a second loan, at a higher interest rate, for another 10-15% of the property's value.  (*Id.* ¶ 3.)

[13]    The seven are Genworth Mortgage Insurance Company, Mortgage Guaranty Insurance Company, PMI Mortgage Insurance Company, Radian Guaranty, Inc. and Amerin Guaranty Corporation, Republic Mortgage Insurance Company, Triad Guaranty Insurance Corporation, and AIG United Guaranty Mortgage Insurance Company.  (D.H. Decl. ¶ 3.)

Before closing of WFHM-originated loans and upon WFHM's acquisition of loans originated by correspondent lenders, the borrower is given a "Consumer Reinsurance Election" stating:

> A Wells Fargo affiliate may elect to share some of the risk and premium associated with these products by "reinsuring" the mortgage insurance and title insurance risk. ...
>
> If you would prefer that an affiliate of Wells Fargo not provide reinsurance on the mortgage or title insurance associated with your loan, please call our consumer reinsurance election toll free number (1-877-291-4327) and leave a message to that effect. ...[14]

About 4,000 borrowers have called the toll free number and, of them, about 3,000 stated their election not to have North Star reinsure their mortgage or title insurance. (D.H. Decl. ¶ 15.) Liguori acknowledges that the Consumer Reinsurance Election provides borrowers the option of prohibiting reinsurance through a Wells Fargo affiliate.[15]

Liguori obtained his mortgage from WFHM in June 2007. (D.H. Decl. ¶ 24.) His PMI was issued by Mortgage Guaranty Insurance Company "MGIC." (*Id.* at ¶ 4.) Like most borrowers, Liguori did not pay the entire PMI premium at closing but instead pays $190 per month toward his PMI premium in addition to his regular monthly payment on his loan. (*Id.* ¶ 25.)[16]

---

[14]     *See* D.H. Decl. ¶ 15, Ex. E.

[15]     Ligouri Deposition ("Ligouri Dep.") 126:21-127:16 attached as Ex. A to Declaration of Michael J. Steiner ("S. Decl.")

[16]     Under the Homeowner's Protection Act of 1998 (12 U.S.C. § 4901 et seq.), PMI must be canceled by the loan servicer once the borrower pays the loan down to 78% of property value, so long as the borrower is current in repaying the loan. 12 U.S.C.

(Fn. cont'd)

**B.    Reinsurance**

PMIs reduce their exposure through reinsurance that transfers all or part of their risk to a reinsurer that assumes the transferred risk in return for a share of the premium. "In this way, a reinsured spreads its risk of loss from its direct-loss policies among other insurers."[17] These types of arrangements are "common in the insurance industry and are regularly entered into without consequence."[18]

North Star, a Wells Fargo subsidiary, is a Vermont captive insurance company that reinsures PMI risks. (D.H. Decl. ¶ 13.) North Star has reinsurance agreements with the seven principal PMI insurers. (*Id.* ¶¶ 3, 4.) North Star's reinsurance agreement with MGIC for the book year beginning in June 2006 provides for "quota share" reinsurance. The rest of the agreements provide for "excess-of-loss" reinsurance. (*Id.* ¶ 4.)

> "The characteristics of the quota share ... are that a reinsurer takes a given percentage of the risk of each underlying policy and also receives a certain percentage of the premiums charged, all within stated upper limits of liability." In excess of loss reinsurance ..., the reinsurer indemnifies "all or a percentage, usually high, of the excess of loss on the reinsured risks, above a stated amount, after

---

(Fn. cont'd)

§ 4902(g)(1).  Alternatively, a borrower may demand cancellation of PMI upon submission of an acceptable appraisal showing that the property's value is now 125% of the loan balance.  *Id.* § 4902(a).  Monthly payments for PMI must cease within 30 days of cancellation by either method.  *Id.* § 4902(e).

[17]    *N. River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 137 (2d Cir. 2004); *Am. Bankers Ins. Co. of Fla. v. NW Nat'l Ins. Co.*, 198 F.3d 332, 1334 n.1 (11th Cir. 1999) ("The purpose of there reinsurance contract is to diversify the risk of loss and to reduce the required capital reserves.")

[18]    *McCulloch v. Hartford Life & Accident Ins. Co.*, 363 F.Supp.2d 169, 182 (D. Conn. 2005).

the collection of any proportional reinsurance and up to a stated limit."[19]

North Star's excess-of-loss reinsurance agreements differ from one PMI insurer to another and among North Star's 65 separate book years of reinsured loans in three principal variables: (i) the loss threshold above which North Star bears the risk (known as the "entry point"), (ii) the size of the risk tier North Star assumes, and (iii) the premium North Star is paid and the ceding commission it remits to the PMI insurer. (D.H. Decl. ¶¶ 8-11.)

Entry points vary with risk. (*Id.* ¶ 8(a).) North Star accepts lower entry points for less risky loans. (*Id.*) North Star's excess-of-loss reinsurance agreements set separate entry points for fixed as opposed to variable interest rate loans[20] and within those categories for loans in LTV ratio bands of 80-85%, 85-90%, 90-95%, and 95-97%. (*Id.*) For example, a reinsurance agreement may provide for an entry point on fixed 80-85% LTV loans of 1.6% of the loan amount, while, under the same agreement, the entry point on variable rate 90-95% LTV loans is 6.4%. (*Id.*) The array of entry points differs by PMI insurer.[21] Under its excess-of-loss reinsurance agreements, North Star is liable when

---

[19]    *Travelers Cas. & Sur. Co. v. Certain Underwriters*, 96 N.Y.2d 583, 588, 760 N.E.2d 319 (2001) (citations omitted).

[20]    Loans are deemed "fixed" if the interest rate is not readjusted during at least the first five years of the loan. (D.H. Decl. ¶ 8(a).)

[21]    For example, while for one PMI insurer, entry points might be 1.6% for fixed 80-85% LTV loans and 6.4% for variable rate 90-95% LTV loans, entry points for another PMI insurer for the same loans at the same reinsurance premium could be respectively 2% and 7.1%, or 1.8% and 4.8%. (*Id.* ¶ 8(b).)

the PMI insurer's losses on all of the reinsured loans exceeds the total of these entry points expressed as dollar amounts.[22] (*Id.* ¶ 8(c).)

North Star's reinsurance agreements also limit its maximum liability. This limit is expressed in terms of the size of the risk tier North Star reinsures. (*Id.* ¶ 9.) The risk tier varies from a low of 3% to a high of 10% of the principal balance of reinsured loans—or in absolute dollars from a low of $4.5 million to a high of $131 million, depending on the PMI insurer and year of the reinsurance agreement. (*Id.*) North Star is liable for losses over the entry point and within the risk tier, but not losses in excess of the risk tier. (*Id.*)

North Star's reinsurance agreements also vary in terms of gross reinsurance premium charged—from 20% to 50% of the PMI premium depending on PMI insurer and year. (*Id.* ¶¶ 10, 11.) The underlying PMI premium varies according to various risk characteristics of each reinsured loan. (*Id.* ¶ 6, Ex. A.) Since the reinsurance premium is set as a percentage of the underlying PMI insurance premium, the dollar amount of reinsurance premium also varies from one reinsured loan to the next according to the same risk factors. (*Id.* ¶ 7.)

North Star pays the PMI insurer a ceding commission to cover North Star's share of the cost of underwriting, administration, and claims handling on the underlying PMI insurance policies. (*Id.* ¶¶ 10, 11.) Those commissions range up to 25% of the

---

[22]    The total entry point dollar amount is computed by multiplying loan amount by the entry point for each loan individually and then summing these products for all loans covered under a particular reinsurance agreement. North Star is liable to reimburse the PMI insurer for losses which exceed that dollar amount. (*Id.* ¶ 8(c).)

reinsurance premium. Reinsurance premiums, net of commission, vary from 15% to 45% of PMI premium. (*Id.* ¶ 11.)

Under its reinsurance agreements, North Star remains liable for losses in the reinsured risk tier for 9 or 10 years after the reinsured book year. (*Id.* ¶ 13.) In other words, North Star is subject to risk of loss on its 2008 reinsurance agreements until 2018.[23] Because of this long exposure to loss, Fannie Mae and Freddie Mac require reinsurers, such as North Star, to place reinsurance premiums in a trust account from which withdrawals, to date, have been allowed only to pay taxes and commercially reasonable, direct expenses. (*Id.*) However, North Star has yet to pay its parent Wells Fargo Bank any dividends. (*Id.*)[24]

### C.    RESPA

HUD has concluded that such "captive reinsurance arrangements are permissible under RESPA if the payments to the reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are *bona fide* compensation that does not exceed the value of such services." HUD 1997 letter (Steiner Decl., Ex. B.)

The first prong of this two-part test may be satisfied upon a showing that: (a) there is a legally binding contract for reinsurance; (b) the reinsurer maintains adequate capital reserves which comply with the law of the state in which it is chartered; and (c) real risk is transferred. *Id.*

---

[23]    In the final year of the reinsurance period, North Star may also be liable to pay the estimated future losses on reinsured loans then in default. (*Id.* ¶ 16.)

[24]    A lone exception arises form the early termination of an early book year with a now defunct PMI, Amerin, because there were too few loans remaining in the book to justify the ongoing administrative expense of holding the pool open. (*Id.*)

The second prong requires a comparison, using relevant mathematical models, of the risk borne by the reinsurer against reinsurance premiums, an analysis of the likelihood, magnitude and volatility of reinsured losses, amount and timing of payments, current market discount rates, relative risk exposure of the insurer and the reinsurer, and an examination of whether the ceding commission is commensurate with the administrative costs the insurer assumes. *Id.*

Liguori bases his entire case on the simplistic notion that the reality and amount of risk transfer can be judged by comparing reinsurance premiums received with reinsured losses paid over the 6-year period from 1999 to 2005. (Compl., ¶¶ 60, 63; Liguori Memo., p. 11.) That idea is patently false.

In the first place, North Star's reinsurance obligation endures for 10 years, not 6. Liguori's 6-year comparison does not take into account losses that North Star may suffer during the final 4 years of its reinsurance exposure. (D.H. Decl. ¶ 16.) Loss is more likely in the later years of the reinsurance period for several reasons. PMI losses normally take a substantial period to develop. (*Id.* ¶ 17.) PMI pays only after the borrower has defaulted, the lender has foreclosed, and the lender suffered a loss upon foreclosure or upon resale afterwards. (*Id.*) Delays occur at each step of this process. Borrowers may first default months or years after loan closing. Lenders may delay foreclosure to allow the borrower a chance to cure a default through a forbearance or workout agreement. The foreclosure process takes a substantial period. Resale may not occur for some time as well. (*Id.*) Also, it takes even longer for a PMI insurer's losses to reach the excess-of-loss reinsurance agreement's entry point. (*Id.* ¶ 16.) Each successive

year's losses are added to the total, so that, generally speaking, the chance of piercing the

reinsurance risk tier increases every year during the 10-year reinsurance period. (*Id.*)

In the second place, PMI losses may vary widely depending on macro-economic

cycles that take considerably longer than 6 years to play out.[25]  For example, losses on

PMI and PMI reinsurance for loans originated before 2004 will be unusually low.  Due to

historically low interest rates, borrowers refinanced an unusually high percentage of loans

during 2003-2004, relieving PMI insurers and their reinsurers of risk on the paid-off

loans that were originated between 1999 and 2003.  (*Id.* ¶ 18.)

Over the last two years, the economic cycle has swung dramatically in the

opposite direction.  (*Id.* ¶ 19.)  Interest rates have risen, drastically decreasing the rate of

refinancings, while the number of borrower defaults and foreclosures has skyrocketed.

(*Id.*)  Falling house prices nationwide have increased the likelihood and severity of

lenders' losses on foreclosure.  (*Id.* ¶¶ 19, 20.)  One PMI insurer has already announced

that it expects losses on loans originated in 2005 and 2006 to pierce reinsurance risk tiers

in the foreseeable future.  (*Id.* ¶ 20.)  Another "predicted . . . that [mortgage] reinsurers

will have to pay out $500 million to $1 billion for loans from 2006 and 2007."  (*Id.*,

Ex. G.) ████████████████████████████████████████████

████████████████████████(*Id* ¶ 21.)

Thus, instead of Liguori's simplistic short-term comparison of claims paid against

premiums earned, proper evaluation and pricing of the risk transferred by an excess-of-

---

[25]    Liguori's short-term comparison is analogous to arguing that an earthquake
insurer has undertaken no risk because it has not paid earthquake losses for 6 years while
taking in substantial premiums.  All it takes is one Northridge Earthquake to disprove that
fallacy.  *See, e.g.,* Liz Mullen, *20th Century Industries takes a big hit from quake*, L.A.
Bus. J. (Feb. 14, 1994).

loss reinsurance agreement requires a rigorous actuarial evaluation of the historical pattern of losses on similar PMI over a much longer period, an assessment of pertinent economic trends, and an analysis of the risk characteristics for the reinsured loans, all as impacted by a particular reinsurance agreement's entry points and risk tier size.

Since inception of its PMI reinsurance program, North Star has obtained opinions from a nationally qualified actuarial firm. These opinions show that there was an actual transfer of risk commensurate with reinsurance premium paid. (*Id.* ¶ 12.)

## III.

## LEGAL STANDARD

"To obtain class action certification, plaintiff[] must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). A court must conduct a "rigorous analysis" to determine whether the plaintiff has met his burden as to each prerequisite. *Beck v. Maximus Inc.*, 457 F.3d 291, 297 (3d Cir. 2006).

"[R]igorous analysis" requires "the court [to] probe behind the pleadings before coming to rest on the certification question."[26] Thus, contrary to Liguori's assertions (Liguori Memo, pp. 4, 14), a court cannot simply accept the complaint's substantive allegations as true. Indeed, at times "not only [is] it appropriate, but also necessary, for the district court to examine the factual record underlying plaintiffs' allegations in making its certification decision." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 189 (3d Cir. 2001). To that end, it should "make whatever factual and legal inquiries are

---

[26]    *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982).

necessary under Rule 23." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d. Cir. 2001). [27]

## IV.

## LIGUORI IS NOT TYPICAL OR ADEQUATE

A court evaluating typicality asks whether the named plaintiff's claims are, in "common-sense terms," typical of the class, i.e., whether his "incentives . . . are aligned with those of the class." *Beck*, 457 F.3d at 296 (quoting *Baby Neal*, 43 F.3d at 55). Similarly, a court makes the adequacy inquiry "to uncover conflicts of interest between named [plaintiff] and the class [he] seek[s] to represent." *Id.* (quoting *Amchem*, 521 U.S. at 625.)

Typicality cannot be satisfied where the "the named plaintiff's individual circumstances are markedly different" than those of his class or "the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Johnston*, 265 F.3d at 184 (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)).

Further, courts may deny class certification when the named plaintiff is subject to a unique defense. *Id.* (citing *J.H. Cohn & Co. v. Am. Appraisal Assocs.*, 628 F.2d 994, 999 (7th Cir. 1980)). [28] Even when the named plaintiff's claim is typical, "'class

---

[27] *Accord: In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 40-42 (2d Cir. 2006); *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005); *Unger v. Amedisys, Inc.*, 401 F.3d 316, 319 (5th Cir. 2005); *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001); *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984).

[28] Questions regarding defenses uniquely available to the defendants against the named plaintiff "bear on both the typicality and adequacy of a class representative." *Id.*

(Fn. cont'd)

certification is inappropriate where [he] is subject to unique defenses which threaten to become the focus of the litigation.'" *Shiring v. Tier Techns., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)); *Powers v. Lycoming Engines*, 245 F.R.D. 226, 236 (E.D. Pa. 2007).

It is not necessary that the unique defense succeed in defeating the named plaintiff's claim; the mere "'presence of even *an arguable defense* peculiar to the named plaintiff . . . may destroy the required typicality.'" *Id.* (quoting *J.H. Cohn*, at 999) (citations omitted).[29]

### A.  Liguori's "Quota Share" Reinsurance Renders Him Atypical And Inadequate

Beginning in June 2006, MGIC modified its reinsurance contract with North Star to provide for quota share reinsurance rather than excess-of-loss. (D.H. Decl. ¶ 4.) Since Liguori obtained his mortgage and PMI through MGIC in 2007, his mortgage insurance is reinsured by North Star under the new quota share arrangement. (*Id.*)

In this respect, Liguori differs from most of the putative class members, whose mortgage insurance was reinsured under "excess-of-loss" reinsurance agreements. The difference is crucial. HUD has expressly approved of quota share reinsurance since it necessarily involves a "real transfer of risk." In actual terms, North Star assumes 50% of

---

(Fn. cont'd)
(citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1764 (3d ed. 2005) (noting securities class actions in which a unique defense defeated typicality); *id.* at § 1765 (citing cases in which a unique defense defeated adequacy of representation)).

[29]  *See Labs, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) (rejecting certification where "unique defenses could conceivably become the focus of the entire litigation").

MGIC's risk in return for 50 cents of every dollar Liguori pays for mortgage insurance. (D.H. Decl. ¶ 4.)

As HUD put it, "[t]his requirement for **a real transfer of risk would clearly be satisfied by a quota share arrangement**, under which the reinsurer is bound to participate *pro rata* in every claim." HUD 1997 Letter (emphasis added). Liguori does not dispute any of this; in fact, he quotes this same HUD statement in his Complaint. (*Id.* ¶ 50.) Apparently, he just assumed he had excess-of-loss reinsurance, the true target of this action.

In any event, Liguori does not have a RESPA Section 8 claim, which not only means that his claim should be dismissed but that he is not a typical or adequate representative of putative class members who at least have an arguable RESPA claim as their mortgage insurance was reinsured under excess-of-loss agreements.[30]

**B.    Liguori's Conflict Of Interest With The Time-Barred Class Members Renders Him Atypical And Inadequate**

A class representative cannot adequately protect the class if his interests are in conflict with the objectives of those who he represents.[31]

The otherwise time-barred claims of many thousands of putative class members hinge on the complaint's equitable tolling allegations. According to these allegations, the "putative Class members could not, despite the exercise of due diligence, have discovered

---

[30]    *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 466 (9th Cir. 1973) ("plaintiff who has no cause of action against the defendant cannot fairly and adequately protect the interest of those who do have such cases of action"); *Audler v. CBC Innovis Inc.,* 519 F.3d 239, 244 (5th Cir. 2008); *see Com. of Pa. v. Porter,* 659 F.2d 306, 335 (3d Cir. 1981); *Killian v. McCulloch,* 873 F.Supp. 938, 945 (E.D. Pa. 1995).

[31]    *Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir. 1998); *Donovan v. Estate of Fitzsimmons,* 78 F.2d 298, 323 (7th Cir. 1985); *see Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.,* 745 F.2d 248, 263 (3rd Cir. 1984).

the underlying basis for their claims" because "Defendants . . . actively concealed the basis . . . by engaging in a scheme that was . . . self-concealing." (Compl., ¶ 93; *see also* ¶¶ 94-100.)

However, Liguori's own experience contradicts these allegations. He was able to discover his claim on time through the exercise of minimal diligence.[32] He has also acknowledged that the Consumer Reinsurance Election did not conceal but rather disclosed the reinsurance arrangement and gave him the option of opting out of that arrangement.[33] Further, he has testified that he does not recall Wells Fargo doing anything to prevent him from discovering his claim against it.[34]

These facts put Liguori at odds with the vast majority of putative class members whose claims are time-barred, forcing them to justify their lack of due diligence or inability to discover the facts and claim that Liguori admits he found easily. "A class representative should 'not be permitted to impose such a disadvantage on the class.'" *Beck*, 457 F.3d at 297 (quoting *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1165 (7th Cir. 1974)).

## C.    Liguori Lack Of Standing Against Unnamed Affiliates Renders Him Atypical And Inadequate

"A litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *see Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1088 (3d Cir. 1975).

---

[32]    Ligouri alleges that he reviewed his loan documents (Compl., ¶ 99) and testified that he became aware of his claim upon receiving a letter from his attorneys (Ligouri Dep., 253:2-14).

[33]    Ligouri Dep., 126:21-127:16.

[34]    *Id.* 251:7-17.

Liguori proposes that the class be defined to include the claims of borrowers who purportedly obtained their mortgages from Wells Fargo "and/or its affiliates." (Liguori Memo, p. 1; Compl., ¶ 68.) Liguori has no claim against Wells Fargo's affiliates. He obtained his mortgage from Wells Fargo directly. (K.H. Decl. ¶ 4.)

Because Liguori has no standing to assert a claim against purported Wells Fargo affiliate lenders, he "is certainly not in a position to 'fairly insure the adequate representation' of those alleged to be similarly situated." *Kauffman v. Dreyfus Fund Inc.*, 434 F.2d 727, 734 (3d Cir. 1970).[35]

## V.

## NON-COMMON FACTUAL AND LEGAL ISSUES PREDOMINATE

Rule 23(b)(3)'s "predominance "criterion is far more demanding" than Rule 23(a)(2)'s commonality requirement.[36] *Amchem Prods., Inc.*, 521 U.S. at 624. The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. That is to say, "predominance" tests whether trial on a class basis will really achieve economies of time, effort and expense without sacrificing procedural fairness.

To decide whether common issues predominate, as required for certification under Rule 23(b)(3), "the court must identify issues involved in the case and determine

---

[35]     "It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

[36]     Unlike Rule 23(b)(3)'s predominance criterion, Rule 23(a)(2)'s commonality requirement "has been construed liberally" and may be satisfied if class members share either common legal issues or a common core of facts. *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1225 (9th Cir. 2007).

which of them 'are subject to generalized proof ... applicable to the class as a whole' and which must be the subject of proof on behalf of individualized class members. 'Because no precise test can determine whether common issues predominate, the court must pragmatically assess the entire action and the issues involved.' "[37] "[J]ust because the legal issues or underlying theories of recovery involved may be common to all class members does not mean that the proof required to establish those same issues is sufficiently similar to warrant class certification."[38]

In this case, such a pragmatic assessment leads to the conclusion that no class should be certified. At least seven liability and defense issues cannot be established by common proof. Each, by themselves, renders trial of this case on a class basis unmanageable. Combined, the non-common issues overwhelm any common proof Liguori might offer.

## A.    RESPA Liability Is A Non-Common Issue

To prove defendants violated RESPA, Liguori must show that there was no genuine transfer of risk to North Star, or that the reinsurance premium paid to North Star was grossly excessive for the risk transferred.

---

[37]    *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 651 (N.D. Cal. 2007) (Walker, J.) (citation omitted); *accord: Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 251 (C.D. Cal. 2006); 7AA Wright, Miller & Kane, *Federal Practice & Procedure*, § 1785 (3d ed. 2005).

[38]    *Dumas v. Albers Med., Inc.*, 2005 WL 2172030 at *3 (W.D. Mo. 2005); *accord: Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir. 1977), *cert. denied,* 434 U.S. 1086; *Elizabeth M. v. Montenez*, 458 F.3d 779, 786-87 (8th Cir. 2006); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234-35 (11th Cir. 2000); *Hyderi v. Wash. Mut. Bank*, 235 F.R.D. 390, 399-403 (N.D. Ill. 2006); *Schwartz v. Dana Corp./Parish Div.*, 196 F.R.D. 275, 283-84 (E.D. Pa. 2000).

Courts have confronted these same issues before in the many putative class actions challenging yield spread premiums ("YSPs") as RESPA-prohibited kickbacks. In that context, HUD emphasized that to determine whether a YSP was a prohibited kickback, a court should engage in a two-step analysis, first determining whether the loan broker who received the YSP actually performed compensable services, and second, assessing whether the broker's total compensation, including the YSP, was "in the ballpark"—that is, reasonably related to the fair market value of the services that the broker performed.[39] Like most other Courts of Appeals, the Ninth Circuit concluded that this test inherently raised predominant individual issues that precluded class certification:

> Yield spread premiums are not illegal per se, so whether they amount to a prohibited referral in any particular case depends upon the services provided by the broker and the total compensation paid for those services. This necessarily means that individual issues predominate, and that a class action is not superior.[40]

Without citing *Schuetz* or any of the similar cases, Liguori tries to distinguish them by urging that North Star did not enter into reinsurance agreements with respect to each individual borrower's loan. (Liguori Memo., pp. 11, 19-20, 28.) *Schuetz* is not so easily cast aside. By pointing to the lack of individual reinsurance agreements—a fact he

---

[39]    *Shuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1013 (9th Cir. 2002); Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052, 53055 (Oct. 18, 2001).

[40]    *Shuetz*, 292 F.3d at 1014; *accord: Culpepper v. Irwin Mortg. Corp.,* 491 F.3d 1260, 1275-76 (11th Cir. 2007); *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732 (5th Cir. 2003); *Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257 (11th Cir. 2002); *Glover v. Standard Fed. Bank*, 283 F.3d 953 (8th Cir.2002); *accord*: *Warburton v. Foxtons, Inc.*, 2005 WL 1398512 at *7 (D.N.J. 2005).

introduces no evidence to prove—Liguori shows at most that, in this case, application of

HUD's two-prong test will not require evidence of facts individual to each borrower.

Negating the need for individual proof does not satisfy Rule 23(b)(3)'s

predominance criterion, however, as non-common—though not individual—proof may,

and in this case will, be needed to measure North Star's reinsurance arrangements against

HUD's two-pronged test.

HUD advises that a number of factors be considered in applying that test. A

breakdown of just a few of these factors illustrates how disparate the evidence would be

in this case:

1. <u>Whether there is a legally binding reinsurance contract with terms and conditions confirming to industry standards</u>. As already discussed (pp. 8-11 above), North Star entered into separate reinsurance agreements with each of the seven PMI insurers. (D.H. Decl. ¶ 4.) The terms and conditions of these agreements, including risk transferred—i.e., risk entry points and risk tier size—and net compensation—i.e., gross reinsurance premium and ceding commission—varied among the seven PMI insurers and among 65 book years of reinsured risk. (*Id.* ¶¶ 4, 8-11.) Many of these terms and conditions were modified through addendums and amendments. (*Id.* ¶ 4.)

2. <u>Whether the reinsurance contract between the PMI and reinsurer established adequate capital reserves</u>. Actual dollar amounts required in the trust accounts varied based on the amount of insurance written (i.e., the risk that North Star insures), the loss reserves the PMI required North Star to hold, and the premiums earned (the contingency reserves).

3. <u>Whether there was a real transfer of risk to the reinsurer</u>. The HUD 1997 letter states that excess-of-loss reinsurance arrangements provide for real transfer of risk —"if the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band." The band of North Star's potential exposure varied from one reinsurance agreement to another and one book year to another because of variations in the entry points and risk tier. Accordingly, evidence particular to each of the many book years of reinsured loans will be needed to establish or disprove the requisite "reasonable business justification." Other than her patently fallacious 6-year comparison of claims against premiums, Liguori suggests no common evidence that could possibly disprove the existence of a business justification for all North Star's reinsurance agreements, when they range so widely in band of North Star's potential exposure.

4.    <u>Whether the compensation paid to the reinsurer is commensurate with the risk borne.</u> Net compensation (premium minus ceding commission) paid to North Star varied loan-by-loan based on risk, as in many cases did the critical entry point for reinsured risk as well.

Liguori no doubt will argue that Judge Alsup's decision in *Kay* is dispositive since he found these individual issues "not so particularized that it [would] overshadow the common issues." *Id.* at 576. Though Liguori invokes *Kay* repeatedly he fails to mention that Judge Alsup denied certification to the time-barred class members, the vast majority of the class, narrowing the class period to 2006-2007. *Id.* at 578-79. In so doing, Judge Alsup eliminated from consideration most of the reinsurance agreements with the seven PMI insurers in effect from 1998-2005. This meant that instead of comparing 65 book years of reinsured risk and all the various modifications to the terms and conditions of the reinsurance agreements, the court would only have to consider the seven agreements over a two year period. Only with this restriction of the class did Judge Alsup find the issues and evidence susceptible to class treatment.

Liguori cannot have his cake and eat it too. If he wants to rely on *Kay*, he must be willing to live with the entire decision, including the exclusion of untimely claims and a smaller, more manageable class.

**B.    Statute Of Limitations Defense Raises Non-Common Issues**

As the Court will recall, Defendants previously moved to dismiss or strike claims of putative class members whose loans closed more than a year before Liguori commenced this case, relying on RESPA's one-year statute of limitations, 12 U.S.C. § 2614. The Court found the motion premature at that stage and invited Defendants to "renew their Motion at class certification." (June 6, 2008 Order at Doc. No. 37.)

Accordingly, Defendants have renewed their motion so that it may be considered in conjunction with Liguori's motion for class certification. The points and authorities addressed in the renewed motion, incorporated herein, show that Liguori has yet again failed to allege facts sufficient to invoke equitable tolling.

Yet, even if it had been properly averred, equitable tolling creates a predominant individual issue precluding certification of the proposed class.[41]

Liguori bears the burden of proving "that resolution of the statute of limitations defense on its merits may be accomplished on a class-wide basis." *Thorn*, 445 F.3d at 321. Liguori has not tried to, and cannot, meet that burden for good reason: He cannot establish by common proof that each time-barred class member (1) did not have sufficient knowledge of his or her claim or (2) could not "by the exercise of reasonable diligence, have discovered essential information bearing on his or her claim."[42]

The requisite knowledge can come from any of a wide variety of sources: related lawsuits, government investigations, public hearings, regulatory filings, defendant's disclosures, and media coverage, to name only a few possibilities.[43] Judge Alsup identified multiple sources of information available to the time-barred class members

---

[41]    *See Thorn*, 445 F.3d at 320-24; *Barnes*, 161 F.3d at 149; *Broussard v. Meinecke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998); *LeBauve v. Olin Corp.*, 231 F.R.D. 632, 674-75 (S.D. Ala. 2005); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 487-88 (E.D. Tex. 2004); *O'Connor*, 197 F.R.D. at 409, 411; *Kelley v. Galveston Autoplex*, 196 F.R.D. 471, 477-78 (S.D. Tex. 2000).

[42]    *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004); *Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 509 (3d Cir. 2006).

[43]    *See Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007); *In re Burbank Envt'l. Litig.*, 42 F.Supp.2d 976, 981-82 (C.D. Cal. 1998); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000); *Hartnett v. Schering Corp.*, 2 F.3d 90, 93 (4th Cir. 1993).

when this case was before him. *Kay*, 247 F.R.D. at 577-78.[44] Indeed, he declined to certify their claims because there was enough information available to them that they "'should have known of the possible existence' of a claim." *Id.* (quoting *Santa Maria v. Pac. Bell*, 202 F.3d 11170, 1178 (9th Cir. 2000)).

At minimum, in a nationwide class, individual class members will have had unequal access to these sources of information. (Larry Steven Londre Declaration "L. Decl." ¶¶ 12-17.) For instance, there was more news coverage of legal challenges to captive reinsurance in large metropolitan media sources than in small town publications, and more in California, Colorado and New York, than in other states. (*Id.* at ¶¶ 9-10.) Characteristics unique to each borrower helped determine whether he or she heard, read or heeded the publicly available information or the written disclosure that Wells Fargo distributed.[45] (*Id.* at ¶¶ 12-17.)

As the Fourth Circuit has pointed out, the relevant question for limitations purposes is not "[w]hether the 'average citizen' (whoever that is) or 'the public' (whoever that is) was or was not 'generally aware' of" the alleged injury, but rather "[w]ere any of the *individual class members* aware, actually or constructively, [of that injury] outside of the limitations period." *Thorn*, 445 F.3d at 322. That question cannot be answered by common proof. Nor can the question of reasonable diligence.

Significantly, the "Consumer Reinsurance Election" Wells Fargo gave its borrowers put them on notice of the North Star reinsurance arrangement. *Kay*, at 578.

---

[44]    *See also Kay v. Wells Fargo & Co.*, 2007 WL 2141292, *4 (N.D. Cal. 2007) (HUD 1997 letter, Consumer Reinsurance Election, chart alleged in plaintiff's complaint, payment schedules)

[45]    *See Migliori v. Boeing N. Am., Inc.*, 97 F.Supp.2d 1001, 1011 (C.D. Cal. 2000).

That disclosure stated explicitly that a "Wells Fargo affiliate may elect to share some of the risk and premium associated with these products by 'reinsuring' the mortgage insurance." (D.H. Dec. ¶ 15, Ex. E.) Furthermore, it gave borrowers the choice to opt out of the reinsurance and provided a toll free number for them to do so. (*Id.*) Many borrowers obviously read the disclosure as evidenced by the fact that some 4,000 of them called the toll free number, made inquiries and, of those, 3,000 decided to opt out. (*Id.*) How, when and why these borrowers were able to exercise the requisite due diligence and others apparently were not are predominantly individual questions.[46]

### C.    Correspondent Loans Raise Non-Common Questions

To prove a RESPA violation, Liguori must show more than simply that North Star was overpaid for the reinsurance it provided. RESPA prohibits an overpayment or "kickback" only if it is paid for the referral of settlement service business. 24 C.F.R. § 3500.14(b).

This element of Liguori's claim cannot be established or disproven by proof common to all class members. In the first place, Liguori cannot show by common evidence that the existence of the North Star reinsurance agreements influenced the selection or referral of each class member to a particular PMI insurer. The reason is simple: WFHM did not originate all the loans. About 20% of the loans North Star reinsured were originated by third-party lenders. (D.H. Decl. ¶ 14.) The third-party lenders selected the PMI insurer on the loans they originated. (K.H. Decl. ¶ 2.) WFHM

---

[46]    Even Ligouri apparently concedes the fact that each individual borrower had the ability to make inquiries using a toll free number and/or opt out raises non-common questions. (Pt's Reply Memo, p. 27, *Moore v. GMAC Mortgage, LLC*, Case No. 07-cv-04296, at Docket No. 89.)

bought these loans only thereafter, and they were placed in North Star's reinsurance pools even later. (D.H. Decl. ¶ 14.)

To establish a RESPA violation with regard to these loans—a substantial proportion of the putative class—Liguori will have to introduce evidence to show that the third-party lender knew that the loan would be sold to WFHM and then be included in North Star's reinsurance pool and that this foreknowledge somehow influenced its decision in selecting a particular PMI insurer. *See* 24 C.F.R. § 3500.14(f).

"Plaintiff has neither alleged such facts nor offered any evidence how this individualized variation could be handled via common proof." *Kay*, 247 F.R.D. at 576.

### D.    Rule 23 Prerequisites Are Not Met For Class Claims Against Unnamed Affiliates

Liguori seeks to certify a class which includes the claims of borrowers whose loans were originated and/or acquired by any of Wells Fargo's affiliates.[47] Liguori does not bother to name any of these affiliates as defendants nor does he allege any facts which would implicate them in this action. Indeed, the only reference to any "claims" against these affiliates is in the proposed class definition. This, of course, does not satisfy even the most liberal pleading standards for stating a claim, meaning the word "affiliates" is immaterial and should be stricken.[48]

Furthermore, Liguori has made no showing that he can satisfy the Rule 23 prerequisites with respect to these unnamed affiliates. He presents no evidence of numerosity, commonality or predominance. And, as explained above (pp. 18-19), Liguori has not met the typicality and adequacy requirements since he personally lacks

---

[47]    Ligouri Memo, p. 1; Compl., ¶ 68.

[48]    Fed.R.Civ.P. 12(f); *see also id.* 23(d)(1)(D)

standing to sue the affiliates. Moreover, the inclusion of hypothetical claims in the class

definition raises a number of non-common questions: Have the affiliates negotiated

reinsurance agreements with any PMI insurer? If so, how did they select the PMI

insurer? Do they reinsure with North Star? What are the terms and conditions of the

agreements, if any, including risk transfer, compensation and capital reserves? Do the

agreements provide for quota share or excess-of-loss reinsurance?

### E.    Individual Questions Predominate Regarding Class Members' Standing Under RESPA

"Any analysis of class certification must begin with the issue of standing."

*Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). To establish standing under

RESPA, Liguori must prove that he and his class members were overcharged for PMI.[49]

In other words, he must show that they paid more for their PMI than they otherwise

would have had it not been reinsured by North Star.

Liguori cannot establish by common proof that such alternative PMI existed at a

cheaper rate. The availability and pricing of PMI will vary considerably depending on

each class member's circumstances including his or her credit rating, LTV, type of loan

product requested (fixed-rate vs. adjustable rate), type of property (investment vs.

residential) and local market conditions. (D.H. Decl. ¶ 6, Ex. A.)

In other words, PMI is individually priced. That it may be cheaper without

reinsurance for one borrower is not proof that all borrowers in the class were

---

[49]    *Carter v. Welles-Bowen Realty, Inc.*, 493 F.Supp.2d 921, 924 (N.D. Ohio 2007); *Contawe v. Crescent Heights of Am., Inc.*, 2004 U.S. LEXIS 2304 (E.D. Pa. 2004); *Mullinax*, 311 F.Supp.2d at 486; *Moore v. Radian Guar. Inc.*, 233 F.Supp.2d 819 (E.D. Tex. 2002).

overcharged. Absent common proof, Liguori cannot establish standing for the class under RESPA.

**F.        Filed Rate Doctrine Creates A Non-Common Defense**

"The filed rate doctrine bars suits against regulated utilities [or insurers] grounded on the allegation that the rates charged by the utility [or insurer] are unreasonable."[50] The doctrine prevents courts from awarding individual customers retroactive relief since a victorious plaintiff would otherwise end up paying less than similarly situated non-suing customers, leading to impermissible discrimination in rates. *Id.* at 19. Also, the filed rate doctrine prevents collateral attacks on the filed rate that would unnecessarily enmesh the courts in the rate-making process. *Id.* Though initially applied to utilities, the filed rate doctrine has been held applicable to regulated insurance rates as well.[51]

In states where PMI rates are filed with and approved by state insurance regulators, the filed rate doctrine will prevent borrowers from proving that they were overcharged for PMI. The filed rate is deemed to be fair; a plaintiff cannot challenge that rate by claiming he was overcharged when he paid it. Unable to show they were overcharged, borrowers in these states will have no claim to relief under RESPA, since, as *Mullinax* holds, damages are recoverable under 12 U.S.C. § 2607(d)(2) only upon proof of an overcharge.

---

[50]        *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).

[51]        *E.g.*, *Morales v. Attorneys Title Ins. Fund, Inc.*, 983 F.Supp. 1418 (S.D. Fla. 1997) (barring a RESPA challenge to title insurance); *Uniforce Temp. Personnel, Inc. v. National Council on Comp. Ins., Inc.*, 892 F.Supp. 1503, 1512 (S.D. Fla. 1995), *aff'd on other grounds*, 87 F.3d 1296 (11th Cir. 1996); *Minihane v. Weissman*, 640 N.Y.S.2d 102, 103 (App. Div. 1996); *Prentice v. Title Ins. Co.*, 500 N.W.2d 658 (Wis. 1993).

State law and practice varies considerably with respect to the filing and approval of PMI rates. In some states, PMI rates are neither filed nor approved by state regulators. Other states (a) require filing of PMI rates within 30 days after they become effective,[52] (b) allow use of PMI rates immediately after filing,[53] or after a set interval,[54] or (c) allow use of PMI rates only after they are both filed and approved by the state regulator.[55]

The filed rate doctrine will, thus, constitute a defense to claims of some class members, but not to others, depending not only on each state's differing insurance law, regulations and practice, but also on non-common proof of each PMI insurer's rate filings and approvals over the course of the class period. "Because [Liguori] seeks certification of a nationwide class for which the law of [50] states potentially applies [at least to the filed rate doctrine defense], []he bears the burden of demonstrating 'a suitable and realistic plan for trial of the class claims.'" *Zinser*, 253 F.3d at 1189. Liguori has submitted no such plan. Absent one, the Court cannot determine whether trial of the case will be manageable on a class basis given the need to apply many differing state laws to at least one crucial liability issue.

## G.    Additional Affirmative Defenses Raise Individual Issues

"[C]lass certification is inappropriate if individual defenses will be widespread through the class and vary significantly among class members." *Ritti v. U-Haul Intern.*,

---

[52]    *See, e.g.*, Mo. Ann. Stat. § 379.321; Wis. Stat. Ann. § 625.13.

[53]    *See, e.g.*, Conn. Gen. Stat. § 38(a)-676; Del. Code Ann. tit. 18, § 2504; Ind. Code § 27-1-22-4(e); Md. Code Ann., [Ins.] § 11-307; Or. Rev. Stat. § 737.205(1).

[54]    *See, e.g.*, N.H. Rev. Stat. Ann. §412:16; N.Y. Ins. Law, §§ 2305(b)(10), 6504; Tex. Ins. Code § 3502.101; Vt. Stat. Ann. tit. 8, §4688(b), (c)(1); Va. Code Ann. §§ 38.2-1906, 38.2-1912.

[55]    *See, e.g.*, Alaska Stat. § 21.39.041(a); La. Rev. Stat. § 22:620(A)(1); Neb. Rev. Stat. § 44-7513(12); S.D. Codified Laws § 58-11-12.

*Inc.*, 2006 WL 1117878, 11 (E.D. Pa. 2006) (citing *LifeUSA Holding*, 242 F.3d 136, 149 (3d Cir. 2001)); *Broussard*, 155 F.3d at 342.

The following affirmative defenses cannot be resolved on a classwide basis because they entail individual issues.

### 1.    Set-Off

Currently, there are approximately 14,111 borrowers with PMI reinsured by North Star who are delinquent on their mortgage payments to Wells Fargo. (D.H. Decl. ¶ 22.) Should the class prevail on their RESPA claim, Wells Fargo would be entitled to set-off any award to these delinquent borrowers by the amount past due on their loans. Thus, the Court would have to make individualized inquiries with respect to each of 14,000 or so borrowers to determine whether the set-off defense applies and, if so, the specific amount of the set-off. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 438 (4th Cir. 2003) (district court abused its discretion in certifying class where, *inter alia*, affirmative defense of set-off required individualized inquiry).

### 2.    Bankruptcy

An estimated 1,844 borrowers whose PMI is currently reinsured by North Star have filed for bankruptcy. (D.H. Decl. ¶ 23.) Scores of other borrowers who once had PMI reinsured by North Star have also filed for bankruptcy. (*Id.*) Any class member in these two groups, who was discharged from bankruptcy but failed to schedule his or her RESPA claim against Defendants as an asset of the estate,[56] would lack standing to bring that claim in this action. Standing would belong to the bankruptcy trustee instead. 11 U.S.C. § 323(b); *Anderson v. Acme Markets, Inc.*, 287 B.R. 624, 628-30 (E.D. Pa. 2002).

---

[56]    11 U.S.C. § 541(a)(1).

Accordingly, the Court's determination of whether any class member has standing is one that can only be made on an individual, class-member-by-class member basis. *See Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 252, n.10 (C.D. Cal. 2006) ("The Court also agrees that standing with respect to the potential class members and the named plaintiff who have filed for bankruptcy is an issue unique to each individual.").

### 3.    Res Judicata

Res judicata bars recovery for those class members bound by prior judgments. *Schoonmaker v. Hubner*, 1993 WL 311776, 6 (E.D. Pa. 1993) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). Liguori cannot demonstrate by common proof that such a defense can be resolved for a class of this size, involving the claims of hundreds of thousands of borrowers.

## VI.

## CONCLUSION

For the reasons stated above, the Court should deny Liguori's motion for class certification.

Alternatively, should the Court decide to certify a class with Liguori as the class representative, the definition should be limited to: Wells Fargo Bank mortgage borrowers who obtained mortgage loans between January 22, 2007 and July 29, 2008, and had private mortgage insurance reinsured by North Star under a quota share arrangement, excluding correspondent loans and unnamed affiliates.

Respectfully submitted by,

BY: /s/*Michael J. Steiner*
Michael J. Steiner (admitted *pro hac vice*)
John B. Sullivan (admitted *pro hac vice*)
Mark D. Lonergan (admitted *pro hac vice*)
Joshua E. Whitehair (admitted *pro hac vice*)

SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, 26th Floor
San Francisco, CA 94111
(415) 398-3344

Lee Applebaum (PA ID NO. 51646)
FINEMAN, KREKSTEIN & HARRIS, P.C.
Mellon Bank Building, 6th Floor
1735 Market Street
Philadelphia, PA 19103
(215) 893-8702

Attorneys for Defendants Wells Fargo &
Company, Wells Fargo Bank, N.A. and
North Star Mortgage Guarantee Reinsurance
Company

DATED:  September 5, 2008.